852 F.2d 485
 W.O. NARRAMORE and Eliza Narramore, Trustees of the
Narramore Investment Trust, S.L. Narramore and Ralph
Narramore, Trustees of the S.L. Narramore Trust, Gila River
Land Co., an Arizona corporation, James Bond, J & R Limited,
an Arizona corporation, and John W. Hadley, Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 87-2139.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 15, 1988.
Decided July 25, 1988.
 
 Richard A. Black, Black, Robertshaw, Copple & Pozgay, Phoenix, Ariz., for plaintiffs-appellants.
 James T. Draude, Asst. Atty. Gen., Dept. of Justice, Washington, D.C., for defendant-appellee.
 Appeal from the United States District Court for the District of Arizona.
 Before KOELSCH and LEAVY, Circuit Judges, and REA,* District judge.
 LEAVY, Circuit Judge:
 
 OVERVIEW
 
 1
 Appellants are owners of 5,398 acres of land subject to flowage easements within the Painted Rock Reservoir. The United States obtained the easements in earlier condemnation actions. The landowners brought an action against the United States, asserting that the Corps of Engineers' operation of Painted Rock Dam and Reservoir exceeds the scope of the property rights granted to the United States by the flowage easements. The district court granted the United States' motion for summary judgment against the landowners' claims. We reverse.
 
 FACTS AND PROCEEDINGS IN THE DISTRICT COURT
 
 2
 Construction and Operation of Painted Rock Dam.
 
 
 3
 The Flood Control Act of 1950, Pub.L. No. 81-516, Sec. 204, 64 Stat. 163, 170 & 176 (1950), authorized construction of Painted Rock Dam and Reservoir. Completed in 1959, the dam is located on the Gila River, a principal tributary to the lower Colorado River. Once a perennial stream, the Gila now flows only during floods; consequently, Painted Rock Reservoir is often dry. Painted Rock Dam is an earthfill dam, the bottom of which is 530 feet above sea level. The spillway crest is 661 feet and the dam crest 705 feet above sea level. The maximum storage capacity of the dam is 2,491,700 acre feet. The lands at issue in this appeal lie between 570 and 655 feet, with most of the lands between 580 and 610 feet.
 
 
 4
 Construction of the dam and reservoir project was authorized "substantially in accordance with the recommendations of the Chief of [the Corps of] Engineers" in H.R. Doc. No. 331, 81st Cong., 1st Sess. (1949) [hereinafter Doc. 331]. Flood Control Act of 1950 Sec. 204, 64 Stat. 163, 176 (1950).
 
 
 5
 According to Doc. 331, Painted Rock Dam was necessary to:
 
 
 6
 a) protect areas along the Gila River downstream from the dam from floods originating upstream; Doc. 331 at 18, 24;
 
 
 7
 b) protect farms in the Wellton-Mohawk region from flood damage; id. at VI, 11 (The Wellton-Mohawk region lies along the Gila River downstream from the dam. It is mentioned specifically on the two pages cited.);
 
 
 8
 c) protect the overflow area in the Imperial Valley, California; id. at 18, 24; and
 
 
 9
 d) protect developed areas along the lower Colorado River. Id.
 
 
 10
 Doc. 331 also mentions high groundwater levels as one type of flood damage in the Gila River basin. Id. at 21.
 
 
 11
 Doc. 331 contains a schedule for release of flood waters from Painted Rock Dam. Id. at 27. This schedule is now known as Plan A. Projected releases from the dam under Plan A are based on the level of the reservoir behind the dam. Id. For example, when the reservoir reaches the 660 foot level, water would be released at 22,500 cubic feet per second. Id. However, Doc. 331 notes:
 
 
 12
 The present channel of Gila River downstream from the Painted Rock site will not carry the maximum controlled releases from the flood-control basin (22,500 cubic feet per second) without some overflow and consequent minor local damage. Most lands subject to such flood damage are in the Gila project of the United States Bureau of Reclamation or in local irrigation districts. The Gila project, which is now under construction, has not been completed, and the Bureau's plans for flood protection within the project are not developed.... Further investigation of the problem is necessary: additional channel and levee improvements may be advisable on lower Gila and Colorado Rivers.
 
 
 13
 Id. at 28.
 
 
 14
 Under Plan A it would take 126 days to empty a full reservoir. Plan A was later included as one of two alternative fixed operations schedules in the Corps' 1962 "Reservoir Regulation Manual for Painted Rock Reservoir."
 
 
 15
 The Corps of Engineers has never used Plan A. Instead, when the reservoir has filled to near capacity, the Corps has released water at rates less than those called for under Plan A. Water levels in Painted Rock Reservoir have exceeded 570 feet (near capacity) nine times since 1959. The first such filling did not occur until 1966; however, since February of 1978, the reservoir has filled to above the 570 foot level, on average, more than once a year. The release periods for these floods varied from two months to over a year. On one occasion (1978-1980) water was stored above 570 feet for almost three years. In March 1977 the Corps announced a study to establish a new schedule of operations for water releases because "the existing operating schedule does not meet all needs." According to the study, Plan A was never used because of "possible downstream impacts." The Corps notified one of the landowners in April 1978 that Plan A was "not a viable operation plan."
 
 
 16
 The Corps has not set a new operations schedule for the dam. Instead of operating the dam on a fixed schedule of releases, the Corps has set the rate of release from the reservoir to accomplish a variety of purposes, most importantly, to minimize damage from flood waters in areas downstream from the dam. The Corps has also released water at a rate set to minimize the amount of infiltration into the Wellton-Mohawk Irrigation Drainage District (WMIDD) groundwater. This prevents the water table underlying the WMIDD from rising and flushing saline groundwater to the surface.
 
 
 17
 Condemnation Proceedings.
 
 
 18
 The United States acquired the flowage easements at issue in this appeal through four condemnation actions filed in 1959 and 1960. Compensation was determined through stipulation in one action, and by trial in the other three.
 
 
 19
 The judgments entered in the actions granted the United States a:
 
 
 20
 perpetual right, power, privilege, and easement occasionally to overflow, flood, and submerge said land and all structures and improvements thereon ... in connection with the operation and maintenance of ... Painted Rock Dam and Reservoir.
 
 
 21
 A transcript is available for only one of the condemnation trials. At that trial, Albert Gildea, Chief of the Hydraulic Section of the Los Angeles District of the Corps of Engineers, testified that the Corps sought flowage easements on lands above 580 feet, rather than fee title, because "we did not want to take the land from the owner, only to get an easement to overflow intermittently on rare occasions." Gildea also testified that when the reservoir pool reached "about" the 570 foot level, water would be released at a rate of 5,000 cubic feet per second (cfs) and at the rate of 22,500 cfs when at the 661 foot level. This corresponds with the rates of release set forth in Plan A.
 
 
 22
 Cross-examination of Gildea concerned flood frequency and the effect of sedimentation on the level of the reservoir, not the release schedule for the dam. The Corps presented charts depicting reservoir filling during flood periods and subsequent emptying. The charts were based on a set outflow during and after the flood. According to Gildea's testimony and the charts, the land above 570 feet would be inundated for "five or six" days if the reservoir reached the 600 foot level.
 
 
 23
 Don Keene, chief appraiser for the Corps' Los Angeles District, oversaw preparation of the appraisal reports for the land in the Painted Rock Reservoir from 1949-1956. At a 1984 deposition, he testified that only one flood frequency report chart was used in preparing the appraisal. If, according to the chart, the property was flooded once every five or fewer years, acquisition in fee was recommended. The Corps' engineering staff gave Keene an estimation of the length of time reservoir lands would be inundated. According to the estimation, lands at the 580 foot level would be inundated sixty-two days when the reservoir reached the 661 foot level (capacity). The reservoir would reach that level, on average, only once every 150 years. With smaller floods, the 580 foot level lands were inundated for fewer days.
 
 
 24
 According to Leonard Halpenny, an expert witness for the United States in the Painted Rock condemnation cases:
 
 
 25
 All of the expert testimony in the various [condemnation] cases was based upon filling frequencies and routing studies prepared by the Army Corps of Engineers which used Plan A as the fixed operational discharge of the Painted Rock Dam. This was a tacit, underlying assumption of all experts, be they hydrologists, appraisers or otherwise.
 
 
 26
 * * *
 
 
 27
 [P]rior to 1966 it was not considered by anyone that Plan A discharge would cause any problems downstream. In fact it was assumed that the downstream channel would be able to handle Plan A discharges and that this would be the manner of operation of the dam.
 
 
 28
 During trial the landowners argued that the United States was under no legal obligation to release water from Painted Rock Reservoir according to a set schedule. The landowners' closing argument was as follows:
 
 
 29
 Now, ladies and gentlemen, I ask you to picture from the evidence here what happened. Here is the Painted Rock Dam. Here comes a flood, either minor or major--and the Government isn't guaranteeing that there won't be a major flood next week. And they have got the right to dam it up completely. One of their witnesses said, "Oh, well, we will let it out from the bottom occasionally." They don't have to do that. And the Court will instruct you that we have a right to consider the maximum that the Government has the legal right to do.
 
 
 30
 At no time during the jury instructions was "Plan A" mentioned. The court instructed the jury:
 
 
 31
 In determining the loss caused the defendants [landowners] by the imposition of the perpetual easement for inundation and flooding upon defendants' lands, the jury must assume that the Government will make full use of the easement it has taken in this action. You must assume also that the use of the easement by the United States will be in a manner as injurious to defendants' remaining rights as the easement rights taken by the Government will lawfully permit.
 
 
 32
 The jury returned verdicts awarding the landowners damages in amounts between the values set by the United States and those set by the landowners.
 
 
 33
 Earlier Landowner Actions.
 
 
 34
 The first major flood on the Gila River after Painted Rock Dam's completion occurred in 1966. When the reservoir filled and the Corps failed to release the water in accordance with Plan A, the landowners brought an action to enjoin releases not made in accordance with Plan A. Their motion for a preliminary injunction was denied on the ground of sovereign immunity. The court also stated that the landowners could bring an action under the Federal Tort Claims Act, 28 U.S.C. Sec. 1346(b).
 
 
 35
 After the next major flood in 1973, the landowners brought a second action under the Tort Claims Act. As in the earlier action, they contended that the dam should be operated in accordance with Plan A. The district court dismissed the action and the Ninth Circuit affirmed the dismissal on the ground that the United States is immune from tort liability for negligent dam operation under 33 U.S.C. Sec. 702c. Pierce v. United States, 650 F.2d 202, 205 (9th Cir.1981) (under section 702c "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place"). The Ninth Circuit assumed without deciding that Plan A was incorporated into the legislation authorizing Painted Rock Dam. Id. at 204 n. 2.Proceedings in the District Court.
 
 
 36
 The landowners brought this action in November 1980, asserting five claims:
 
 
 37
 1. Quiet Title--The United States exceeded the scope of the flowage easements when it failed to follow Plan A and operated Painted Rock Dam to maintain water quality in the WMIDD;[1]
 
 
 38
 2. Declaratory Judgment--On the same grounds as above;
 
 
 39
 3. Mutual Mistake--The condemnation judgments were based upon a mutually mistaken belief that the impounded water would be released according to Plan A;
 
 
 40
 4. Trespass--The United States has inundated appellants' lands for longer periods than under Plan A; and
 
 
 41
 5. Civil Rights.
 
 
 42
 Cross motions for summary judgment were filed. The district court denied the landowners' motion and granted the motion of the United States. The landowners do not appeal the grant of summary judgment against their trespass and civil rights claims.
 
 
 43
 The district court based its ruling against the quiet title, declaratory judgment, and mutual mistake claims on several grounds. First, the court found that neither the past flooding nor operation of the dam to protect WMIDD groundwater exceeded the scope of the easements. Second, even if the scope of the easement had been exceeded, the landowners' action was foreclosed by res judicata or collateral estoppel by their assertion, in the condemnation proceedings, that the United States was under no obligation to release water according to Plan A. Third, the quiet title claim was barred by the twelve-year statute of limitations and the mutual mistake claim by laches because the landowners knew in 1966 that Plan A was not mandatory.
 
 STANDARDS OF REVIEW
 
 44
 The grant of summary judgment is a question of law reviewed de novo. Del Madera Properties v. Rhodes & Gardner, Inc., 820 F.2d 973, 975-76 (9th Cir.1987); Darring v. Kincheloe, 783 F.2d 874, 876 (9th Cir.1986).
 
 DISCUSSION
 
 45
 Flowage Easements.
 
 
 46
 The landowners contend that the flooding of their property exceeds the scope of the flowage easements, arguing that the meaning of the easements is to be determined by the United States' evidence in the earlier condemnation actions. They cite United States v. 2,648.31 Acres of Land, 218 F.2d 518 (4th Cir.1955) in support of their argument.
 
 
 47
 It is the responsibility of the reviewing court to construe a judgment so as to give effect to the intention of the issuing court, not to that of the parties. United States v. 60.22 Acres of Land, 638 F.2d 1176, 1178 (9th Cir.1980), cert. denied, 451 U.S. 985, 101 S.Ct. 2318, 68 L.Ed.2d 842 (1981). If the judgment is unambiguous, the court may not consider "extraneous" evidence to explain it. Gila Valley Irrigation Dist. v. United States, 118 F.2d 507, 510 (9th Cir.1941).
 
 
 48
 The judgment at issue here is ambiguous. The term "occasionally" in the phrase "occasionally to overflow, flood and submerge," is susceptible to more than one interpretation. Thus, we may consider extrinsic evidence to explain the judgment. Moreover, the case cited by the landowners, 2,648.31 Acres, does not decide whether the evidence considered should be limited to that of the government in the earlier condemnation action.
 
 
 49
 2,648.31 Acres was an appeal from a condemnation action in which the trial court excluded government evidence offered to prove intermittent flooding of certain lands. The trial court held that the landowners were entitled to recover the fee simple value of the lands. 2,648.31 Acres, 218 F.2d at 520. The Fourth Circuit reversed and held that just compensation was the diminution in value from flooding and that the evidence should have been admitted:
 
 
 50
 The meaning of the language of the declaration [of taking] is under attack but whatever ambiguity exists will be made perfectly clear by the evidence offered by the government which may be considered for this purpose on the remand of the case, and thereby the extent of the right to flood, which is being acquired by the government, will be definitely fixed. This should be clear also in the judgment so that there may be no question as to the landowner's right to recover if, in the future, there is greater flooding as the result of changes in the structure or the operation of the dam.
 
 
 51
 Id. at 524. The opinion orders the government's evidence admitted; it does not decide the issue of whether to admit or exclude other evidence offered on the extent of flooding. Courts have also considered jury instructions given in the earlier condemnation action when interpreting the judgment. 60.22 Acres, 638 F.2d at 1178.
 
 
 52
 In the Painted Rock Dam condemnation actions, the United States based its evidence of the extent and duration of flooding on the Plan A schedule of releases. One essential component of the Plan A schedule was the capability of the Gila River system to absorb releases as great as 22,500 cfs. The landowners argued that the flooding could be greater, in part, because Plan A was not mandatory. The court instructed the jury that they must assume that the United States would "make full use" of the easements to "occasionally" flood the lands.
 
 
 53
 While the landowners argued that flooding could be greater than that presented by the United States, Plan A established a framework around which debate over the extent of flooding centered. If the parties and the court anticipated that releases could not take place in accordance with Plan A or a similar release schedule, the land would not be flooded "occasionally" but for longer and more frequent periods, as has occurred.
 
 
 54
 On remand in 2,648.31 Acres the district court judgment provided that the government must discharge water according to the schedule of releases presented to the jury and reserved to the landowners the right to assert a claim for damages from any greater flooding resulting from failure to comply with the schedule. United States v. Holmes, 238 F.2d 229, 231 (4th Cir.1956). The Fourth Circuit found the provision too rigid, and modified the landowners' right to seek additional damages:
 
 
 55
 [I]f as a result of future changes in the operation of the dam there shall be a greater flooding of the tracts of land here involved than is caused by its present structure and operation.
 
 
 56
 Id. at 231-32.
 
 
 57
 Here, the landowners raised a factual issue whether they have suffered greater flooding than that which would have been caused by Painted Rock Dam's anticipated operation. The district court erred by granting summary judgment on the ground that the flooding did not exceed the scope of the easement.
 
 
 58
 Wellton-Mohawk Irrigation Drainage District Groundwater Protection.
 
 
 59
 The landowners contend that protection of lands in the WMIDD from groundwater infiltration by floodwaters in the Gila River is not an authorized purpose of Painted Rock Dam. Doc. 331 identifies the WMIDD as one area to be protected by Painted Rock Dam. Doc. 331 at VI, 11. The document also mentions high groundwater levels as one type of flood damage to be prevented or reduced by Painted Rock Dam. Id. at 21. Thus operation of Painted Rock Dam to prevent floodwater infiltration of the water table underlying WMIDD is within the authorized purposes of the dam. See Morici Corp. v. United States, 491 F.Supp. 466, 481 (E.D.Cal.1980), aff'd, 681 F.2d 645 (9th Cir.1982) (damage from seepage of floodwaters into groundwater constitutes damage from "floods" or "flood waters" within the meaning of 33 U.S.C. Sec. 702c). The district court correctly found that operation of Painted Rock Dam to protect WMIDD lands did not exceed the scope of the easement.
 
 
 60
 Res Judicata.
 
 
 61
 The landowners assert that the district court erred when it held that their quiet title claim was barred by res judicata or collateral estoppel. Even if the scope of the flowage easements was an issue "actually litigated and necessarily decided" in the condemnation proceedings, the landowners are not barred from now asserting that the United States has exceeded the scope of the easements. See 60.22 Acres, 638 F.2d at 1178; Holmes, 238 F.2d at 231-32. The district court erred in holding their quiet title claim barred.
 
 
 62
 Statute of Limitations.
 
 
 63
 The landowners contend that the district court erred in holding their quiet title claim barred by the twelve year statute of limitations in 28 U.S.C.A. Sec. 2409a(g). They argue that an issue of fact exists whether they or their predecessors in interest knew or should have known that the Corps of Engineers would not follow Plan A in 1966.
 
 Section 2409a(g) provides:
 
 64
 Any civil action under this section shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.
 
 
 65
 28 U.S.C.A. Sec. 2409a(g) (Supp.1988). "The crucial question is when the appellants or their predecessors in interest knew or should have known of the government's claim." Grosz v. Andrus, 556 F.2d 972, 974 (9th Cir.1977). "The existence of one uncontroverted instance of notice suffices to trigger the limitations period." Nevada v. United States, 731 F.2d 633, 635 (9th Cir.1984).
 
 
 66
 The landowners filed this action on November 7, 1980. Thus, the crucial question is whether they knew or should have known of the government's claim before November 1968. In January 1966 the Corps of Engineers failed to release floodwaters stored behind Painted Rock Dam in accordance with Plan A. The landowners brought an action to compel compliance with Plan A in June 1966. The action was dismissed on sovereign immunity grounds.
 
 
 67
 According to an affidavit by one of the landowners, the Corps released water more rapidly after the 1966 action was filed and the landowner claims he was able to plant his fields on schedule that spring. The landowner was not aware that the Corps had abandoned Plan A until 1978 when he was so notified by the Corps. The Corps made public announcement of its intent to change the release schedule for the dam in March 1977.
 
 
 68
 Because the 1966 flooding was of short duration and followed by what could be perceived as government rectification of its mistake, the landowners have raised a factual issue as to their actual notice. Because the Corps' public position until 1977 was that Plan A was still in effect, the landowners cannot be held to constructive notice of a claim on their property in 1966. The district court erred in holding their quiet title claim barred by the statute of limitations.
 
 
 69
 Mutual Mistake.
 
 
 70
 The landowners contend that the district court erred in granting summary judgment against their mutual mistake claim because it was barred by laches. Federal Rule of Civil Procedure 60(b) provides that the rule "does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding." Fed.R.Civ.P. 60(b). Thus, "a federal court, in an independent action, has jurisdiction to modify a final judgment in a former proceeding on the ground of mistake ... at least where mutual mistake is shown and where the party seeking relief is without fault or negligence in the premises." West Virginia Oil & Gas Co. v. George E. Breece Lumber Co., 213 F.2d 702, 706 (5th Cir.1954); see also 11 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2868 (1973). "There is no time limit on when an independent action may be brought, but the doctrine of laches is applicable and undue delay may bar relief." 11 C. Wright & A. Miller, supra, Sec. 2868 at 241.
 
 
 71
 The landowners have raised a material issue of fact when they became aware of their claim. Thus, the district court erred in granting summary judgment based on the equitable defense of laches.
 
 CONCLUSION
 
 72
 The district court's grant of summary judgment against the landowners' action is reversed and remanded for proceedings in accordance with this opinion.
 
 
 
 *
 Honorable William J. Rea, United States District Judge, Central District of California, sitting by designation
 
 
 [1]
 The landowners also alleged that Painted Rock Dam was being operated to maintain the quality of Colorado River Water reaching Mexico. The district court found that the Corps does not store water in or release water from the dam for this purpose. The landowners do not raise this issue on appeal