**The UNITED STATES of America, Plaintiff,**

**v.**

**H.C. ANGLE, et al., Defendants.**

**The WACKERMAN DAIRY, INC., a California Corporation; Hollis E. Reimers, Plaintiffs,**

**v.**

**George G. WILSON, Angle Decree Water Master; The Orland Unit Water Users' Association, a California Corporation; The United States of America, Defendants.**

**No. Civ. S-80-583 LKK.**

United States District Court, E.D. California.

March 21, 1991.

Stuart L. Somach, McDonough, Holland & Allen, Sacramento, Cal., for plaintiffs.

Solomon E. Robinson, Asst. U.S. Atty., Sacramento, Cal., for the U.S.

M. Anthony Soares, Minasian, Minasian, Minasian, Spruance, Baber, Meith & Soares, Oroville, Cal., George G. Wilson, Water Master, Fair Oaks, Cal., for Orland Unit Water Users' Ass'n.

## ORDER

KARLTON, Chief Judge Emeritus.

This matter is before the court on cross-motions for summary judgment. For the reasons I explain below, plaintiffs' motion for summary judgment is DENIED, the motion of defendant United States for summary judgment is GRANTED, and the motion of defendant Orland Unit Water Users' Association ("OUWUA") is GRANTED in part and DENIED in part.

## I

## BACKGROUND

The instant action arises out of a stream-wide adjudication of the rights, titles, and interests in the waters of Stony Creek and its tributaries. In an action commenced in 1918, the United States, as plaintiff, brought suit against several hundred defendants within the Stony Creek watershed, seeking a determination of the parties' water rights. The United States District Court, sitting in equity, issued its decision in 1930 in what is commonly referred to as the "Angle Decree."

Under Article XVI of the Angle Decree, a Water Master is appointed to carry out and enforce the provisions of the decree. Decree at 176. The Angle Decree provides that any person feeling aggrieved by any action of the Water Master may complain to this court and further provides for continuing jurisdiction to review the actions of the Water Master. *Id.* Plaintiffs in the instant action are successors in interest to defendants in the original action whose rights were adjudicated in the 1930 Decree. They allege that defendant Watermaster George Wilson has adopted new interpretations of plaintiffs' water rights that are erroneous and overly restrictive. Plaintiffs have brought suit against George Wilson, Watermaster appointed pursuant to the Angle Decree, the Orland Unit Water Users' Association (OUWUA)[1], and the United States[2], seeking declaratory and injunctive relief with regard to their irrigation and stock water rights under the Angle Decree. The parties have now cross-moved for summary judgment.

## II

## SUMMARY JUDGMENT STANDARDS UNDER FED.R.CIV.P. 56

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Poller v. Columbia Broadcast System,* 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962); *Jung v. FMC Corp.,* 755 F.2d 708, 710 (9th Cir. 1985); *Loehr v. Ventura County Community College Dist.,* 743 F.2d 1310, 1313 (9th Cir.1984).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, deposi-

1. OUWUA administers the Orland Water Project for the United States Bureau of Reclamation. Three major reservoirs are on the Stony Creek. The furthest upstream is the East Park Reservoir. The middle reservoir is the Stony Gorge. These two reservoirs are part of the Orland Project. The furthest downstream reservoir is the Black Butte, which is part of the Central Valley Project.

2. Although the United States was plaintiff in the original action which resulted in the Angle Decree and by the terms of which this court has continuing jurisdiction, the United States for purposes of the present controversy are designated as defendants.

> tions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. at 2552. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323, 106 S.Ct. at 2553.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *Ruffin v. County of Los Angeles,* 607 F.2d 1276, 1280 (9th Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); *Matsushita,* 475 U.S. at 586 n. 11, 106 S.Ct. at 1355 n. 11; *First Nat'l Bank,* 391 U.S. at 289, 88 S.Ct. at 1592–93; *Strong v. France,* 474 F.2d 747, 749 (9th Cir.1973). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Anderson,* 477 U.S. at 248–49, 106 S.Ct. at 2510–11; *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank,* 391 U.S. at 290, 88 S.Ct. at 1593; *T.W. Elec. Serv.,* 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e) advisory committee's note on 1963 amendments); *International Union of Bricklayers v. Martin Jaska, Inc.,* 752 F.2d 1401, 1405 (9th Cir. 1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); *Poller,* 368 U.S. at 468, 82 S.Ct. at 489; *SEC v. Seaboard Corp.,* 677 F.2d 1301, 1305–06 (9th Cir.1982). The evidence of the opposing party is to be believed, *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party,

*Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356 (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam)); *Abramson v. University of Hawaii,* 594 F.2d 202, 208 (9th Cir.1979). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines,* 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985), *aff'd,* 810 F.2d 898, 902 (9th Cir.1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356 (citation omitted).

## III

## STANDARDS OF CONSTRUCTION

The instant action arises out of a controversy over the proper interpretation of the provisions in the Angle Decree. The Decree incorporates stipulations entered into between the United States and the predecessors in interest of the plaintiffs at bar.[3] Plaintiffs contend that because the Decree incorporates these stipulations, which by their terms are intended as "a settlement of the trial of all issues, as between the said plaintiff and defendants in relation to the agreement hereinafter named or otherwise," *see* Decree at 146, 149, the standards of construction applicable to a consent decree must govern in the matter at bar. Because a consent decree is in the nature of a contract, those standards require that a consent decree be construed essentially as a contract. *See Jeff D. v. Andrus,* 899 F.2d 753 (9th Cir.1989). As with a contract, the meaning of its provisions should be ascertained within the four corners of the decree. *See United States v. Armour & Co.,* 402 U.S. 673, 682, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971). Where the meaning is ambiguous, however, resort to extrinsic aids of construction may be had. *See United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238 n. 11, 95 S.Ct. 926, 935 n. 11, 43 L.Ed.2d 148 (1975) (reliance on circumstances surrounding formation of consent decree, technical meaning of words used may have had to parties, and documents expressly incorporated into decree held proper where terms of decree were ambiguous). Moreover, interpretation of a consent decree may be influenced by the reasonable expectations of the parties at the time they entered into the stipulation, *see United States v. Motor Vehicle Mfrs. Ass'n of U.S.,* 643 F.2d 644, 651 (9th Cir.1981), and should be enforced according to the intent of the parties to the stipulation. *See generally* Wright, Miller and Cooper, *Federal Practice and Procedure,* § 443 at 383 (1981).

Defendants contend that the standards applicable to a litigated decree must govern the construction of the terms of the Angle Decree. I note that as an ordinary matter, the issuing court is the best source for interpreting a litigated decree because the judge who generates the order will best know what he had in mind. That aphorism is only metaphorically applicable where, as here, a decree is construed by a successor judge. Certain principles have been developed, however, that can guide a successor court in construing a litigated decree. It is well-established that extraneous evidence may not be considered if the judgment is unambiguous.[4] *Gila*

3. Plaintiff Wackerman Dairy is a successor in interest to Charles M. Hall and Gertrude C. Hall. The stipulation between the United States and the Halls is referred to as the "Hall Stipulation" in the Angle Decree and is incorporated into Article VIII at pages 146–149.

Plaintiff Reimers is a successor in interest to W.E. Scearce, Mary J. Scearce and Olive Scearce Parson. The stipulation between the United States and the Scearces is referred to as the "Scearce Stipulation" in the Angle Decree and is incorporated into Article VIII at pages 149–152.

4. In the related context of determining the scope of res judicata, it has been held that where the judgment is ambiguous or fails to express the rulings with clarity, the entire record before the issuing court and the findings of fact may be referenced in determining what

*Valley Irrigation Dist. v. United States,* 118 F.2d 507, 510 (9th Cir.1941); *Narramore v. United States,* 852 F.2d 485, 490 (9th Cir.1988). The decree must be construed as a whole so as to give effect to all of its words and provisions. *Boundary County, Idaho v. Woldson,* 144 F.2d 17, 20 (9th Cir.1944). In the event there is a conflict between the judgment and the findings of fact, the former must control. *See generally* 46 Am.Jur.2d, *Judgments,* § 76; *see also Eakin v. Continental Illinois Nat. Bank & Tr. Co.,* 875 F.2d 114, 118 (7th Cir.1989) (where judicial opinion is inconsistent with judgment, latter controls because judgment creates the obligation). In contradistinction to a consent decree, the court construing the judgment must give effect to the intention of the issuing court, rather than that of the parties bound by the judgment. *See United States v. 60.22 Acres of Land, Etc.,* 638 F.2d 1176, 1178 (9th Cir.1980).

The Angle Decree embraces aspects of both a consent decree and a litigated decree. Because the Hall and Scearce stipulations were intended by the parties signatory thereto as a settlement of the controversy between them and were incorporated into the Decree, plaintiffs' contention that the Angle Decree should be properly characterized as a consent decree, and that the intent of the parties controls the disposition of the present controversy, appears at first blush to have merit. Upon further reflection, however, it becomes apparent that this argument is unpersuasive. The Angle Decree determined the rights of approximately 600 persons, both between the plaintiff and defendants and among the defendants *inter se.* Those persons, other than the United States, the Halls, and the Scearces were not parties to the stipulations. The Supreme Court has taught us that a voluntary settlement cannot dispose of claims of a third party without that party's agreement. *Martin v. Wilks,* 490 U.S. 755, 767–68, 109 S.Ct. 2180, 2187, 104 L.Ed.2d 835, 848 (1989). Thus, as to the parties that were not signatory to the Hall and Scearce stipulations, the intent of the parties to the stipulations cannot control the construction of the provisions in the Angle Decree.

Moreover, the central characteristic of a consent judgment is that "the court has not actually resolved the substance of the issues presented." Wright, Miller and Cooper, *Federal Practice and Procedure,* § 443 at 383 (1981). That characteristic is conspicuously absent in the Angle Decree. In determining the rights of the parties, the issuing court did not simply stamp a judicial imprimatur on a resolution reached by the parties. Judge Kerrigan issued a 177–page decision on the merits of the claims after twelve years of litigation and hearing on the arguments of counsel. Various stipulations were incorporated into the Decree which explicate the terms of the adjudication. *See, e.g.,* Decree at 116–17, 139, 146–52, 170–72. However, the inclusion of the stipulations does not transfigure the essential function of the Decree, i.e. resolution of the issues on the merits. I conclude, therefore, that in construing the Angle Decree, I must be guided by the standards of construction applicable to a litigated decree. I now turn to the task of interpreting the meaning ascribed to its various provisions by my predecessor.

## IV

## IRRIGATION RIGHTS

The parties to the instant action concede that the Hall and Scearce families had acquired an appropriative water right and that the water right was appurtenant to 90 acres of Hall lands and 100 acres of Scearce lands. The parties also agree that these water rights were transferred to the Stony Creek Irrigation Company and were subsequently acquired by the United States. It is also recognized by all the parties that the United States agreed to provide water from the Orland Project to compensate the Halls and Scearces for the appropriative rights acquired by the United States.

The controversy in the instant suit centers around the amount of Project water

was decided. *Security Mut. Cas. Co. v. Century Cas. Co.,* 621 F.2d 1062, 1066 (10th Cir.1980).

that must be provided without charge to plaintiffs. Plaintiffs contend that the United States stipulated to provide water to all their irrigable lands (a total of 416 acres consisting of 166 acres for plaintiff Wackerman and 250 acres for plaintiff Reimers) and that they are entitled to this water without payment of the customary charges for Orland Project water. Defendants concede that plaintiffs are entitled to 769.5 acre-feet of water for 190 acres but contend that the reasonable rates[5] paid by other Orland Project water users must be paid for Project water serving the remaining irrigable acreage.

In Article VII of the Decree, entitled "Appropriation Rights of Defendants," this court's predecessor determined that the appropriative rights of the Halls and Scearces, with a priority date of 1864, attached to the 190 acres as is described in the appropriation schedule. *See* Decree at p. 121. The schedule also notes that "The United States diverts and delivers the water called for under this appropriation and holds title thereto as described in Articles VIII and XI of this decree." *Id.* Article VIII of the Decree is entitled "The Reserved and Appropriation Rights of Plaintiff for Orland Project." Paragraph five of that article provides that the United States has "[t]he right, by appropriation, to divert 769.5 acre-feet of the waters of Stony Creek and its tributaries ... for the irrigation of the 190 acres of the so-called Hall & Scearce lands ... as same are described in the schedules, respectively designated 'Hall Lands' and 'Scearce Lands', appended to this Article of the decree and made part hereof." Decree at 139. The schedules referred to in paragraph five are found at page 145 and describe the same lands referred to in Article VII. In addition, paragraph five provides that the "mutual relations of plaintiff and [the Halls and Scearces] as to the water rights of said defendants, are as defined in the stipulations made between said parties and filed herein, true copies thereof being appended to this Article ... and made a part hereof." While the stipulations, which define the obligation of the United States to provide Orland Project water free of charge, refer to the "Hall lands" and the "Scearce lands," those lands are not specifically described within the stipulations. Therein lies the genesis of the instant controversy. Plaintiffs contend that the stipulations refer to the 416 acres of Hall and Scearce lands which were included in the Project Land Schedule, *see* Decree at p. 144, whereas defendants contend that the lands referred to in the stipulations refer to the "Hall Lands" and "Scearce Lands" as specially set forth in the separate schedule immediately preceding the stipulations. *See* Decree at p. 145. As I will now explain, plaintiff's argument cannot lie.

Paragraph "c" of the stipulations provides that when the storage water is exhausted early in the season "in years of drought or great scarcity of water ... the available natural flow in the stream, under the priority of the Hall and Scearce appropriations as determined in this adjudication, shall be distributed to the Hall lands and the so-called Scearce lands." Decree at 147–48, 150–51. Since under the Decree, the Halls and Scearces had a priority date of 1864, paragraph "c" accords the highest priority to the Hall and Scearce lands. If, as plaintiffs suggest, the lands referred to in the stipulations are the 416 acres as described in the Project Land Schedule, the effect of paragraph "c" would contradict the priorities as set out in the Appropriation Schedule contained in Article VII, which accords the highest priority to only 190 acres.

Moreover, there is nothing in the structure of the Decree itself that would have indicated to the other Project water users that the highest priority would be given to 416 acres.[6] The 416 acres, as described at

5. The reasonable rate is calculated pursuant to reclamation law and is based on the original construction costs and present-day operation and maintenance costs of the Project.

6. Plaintiffs rely on the Findings of Fact which indicate that certain tracts within the Hall and Scearce ranches were covered by special contracts. At page 185 of the Findings of Fact, the Hall and Scearce lands are specifically described as encompassing 416 acres. Contrary to plaintiffs' contentions, the findings of fact do not clearly state that the water service to be

page 144 of the Decree in the Project Land Schedule, are not differentiated in any way from any of the other lands described in the Project Land Schedule. Nothing in the Decree would have suggested to the approximately 600 other parties whose rights were adjudicated by the Decree that the lands owned by the Halls and Scearces that were listed in the Project Land Schedule would have special privileges not accorded to other lands described in that schedule. However, by separately setting forth the 190 acres of the Hall and Scearce lands in the schedules immediately preceding the stipulations, all parties were put on notice that the stipulations accorded special privileges to the lands described therein. This construction is also in accord with the general structure of the Decree itself wherein water rights attach to land either specifically described in the Decree or in a schedule incorporated into the Decree. Moreover, given that the stipulations are incorporated into Article VIII, it appears logical that it refers to the acreage described in that Article as the Hall and Scearce lands.

Having determined that plaintiffs are entitled to free Project water for only 190 acres, I turn now to the question of the proper measure of that entitlement. Plaintiffs contend they are entitled to a quantity of water without charge based on a calculation using the maximum flow rate multiplied by the days within the irrigation season. They base their contention on language in the stipulations to the effect that "the total amount of water delivered during any irrigation season to said ... lands [is] to be not greater in volume than the amount produced by a continuous flow of 125 miners inches up to July 15th and a continuous flow of 75 miners inches during the balance of the irrigation season." Decree at 146–47; 149–50.[7] Defendants contend that plaintiff's entitlement to free water is limited to 769.5 acre-feet, as set forth in paragraph five of Article VIII. Defendants contend that the language cited by plaintiffs is only intended to set a maximum rate of flow rather than a basis for quantifying the total amount allowed. It appears that defendants' argument is well-taken.

If plaintiffs' construction were adopted, the Decree would allow for grossly disparate amounts of water for adjacent parcels of land. Multiplying the rates of diversion as set forth in the stipulations by an irrigation season of March 15 to October 15 would entitle each plaintiff to a total of 879 acre-feet of water. Dividing this total quantity by the acreage claimed by each plaintiff would yield 5.3 acre-feet per acre for plaintiff Wackerman's 166 acres and 3.5 acre-feet per acre for Reimers 250 acres.[8] A result which allows an adjacent parcel of land to be entitled to one and a half times the amount of its neighbor defies common sense. In construing this Decree, I must give effect to the intention of the issuing court. *See United States v. 60.22 Acres of Land, Etc.*, 638 F.2d 1176 (9th Cir.1980). Plaintiffs' argument, therefore, which dictates a patently irrational result, must be rejected.

Plaintiffs further contend that another clause which addresses continuous flows in monthly periods would be rendered surplusage if defendants' construction is adopted. That clause provides that the to-

provided to the tabulated 416 acres would be without compensation.

Whatever meaning is ascribed to the findings of fact, however, it is irrelevant to construction of the Decree. As I previously noted, the standards of construction applicable to a litigated decree apply in the instant case. Under those standards, extraneous evidence may not be considered if the judgment is unambiguous. Where the judgment conflicts with the findings of fact, the former must control.

7. The stipulation provides that the miners inches are to be calculated under a four-inch pressure—being equivalent to 2.5 cubic feet per second for 125 miners inches and 1.5 c.f.s. for 75 miners inches.

8. Looked at another way, both the Hall and the Scearce stipulations contain identical "continuous flow" clauses. If continuous flow is used to quantify their entitlement, plaintiffs are entitled to equal amounts. Plaintiff Wackerman claims entitlement for 166 acres and plaintiff Reimers claims entitlement for 250 acres. The ratio of these acreages is 250 divided by 166 = 1.506. Under plaintiffs' reasoning, plaintiff Wackerman would get fifty percent more water for his acreage.

tal amount "in any one monthly period of each irrigation season [shall be] not more than would be provided by a continuous flow for one month of 125 miners (if before July 15th) or of 75 miners inches (if after July 15th)." Decree at 147, 150. I cannot agree with plaintiffs' contention, since this clause is directed to a different limitation than the previous clause. Because the stipulations provide that water may be delivered "by way of irrigation heads of greater amount" than the miners inches provided for "in accord with the usual practice on the project," the two clauses act in conjunction to even out the flows so that other water users will be assured of having some quantity of water available. The first clause operates as a limitation on the flow rate for the entire irrigation season, so that if water is diverted at a rate higher than that allotted at one point in time, a lesser flow rate must be used later. The second clause then puts the same limitation within monthly periods and in addition prevents any carryover from month to month.[9] This clause is thus not rendered surplusage by the court's construction.

Although plaintiffs have argued that the stipulations would be meaningless if their interpretation is not adopted, I cannot agree. The stipulations put the Halls and Scearces in a substantially better position than other parties with appropriative rights as enumerated in Article VII of the Decree. The stipulations gave the Halls and Scearces the rights to the water stored by the Orland Project, whereas their appropriative right was based only on natural water. *See* Decree at 147, 150 ¶¶ "c." This confirmed that plaintiffs' predecessors would have access to water during dry years and ensured a stable flow rate. In addition, the stipulations allowed the plaintiffs' predecessors a longer irrigation season. It appears that before the Orland Project was built, there was seldom any water available after July 15, although the irrigation season for those with appropriative rights was determined to be April 15th through September 15th. *See* Decree, Article VII at 120. Under the stipulations, however, plaintiffs' predecessors enjoyed the benefit of an irrigation season that was extended both at the initial and terminal points, i.e. from March 15th to October 15th. *See* Decree, Article XI at 157. Finally, I note that the appropriative right for the 190 acres of the Hall and Scearce lands was limited in the rate of diversion to 2.53 cubic feet per second, *see* Decree at 139, whereas under the stipulations the maximum rate of diversion was 5.0 c.f.s. (2.5 c.f.s. allotted per stipulation). This represents a significant advantage over the appropriative right. Considering these substantial benefits, I cannot sustain plaintiffs' arguments that the construction I adopt renders the stipulations a nullity.

## V

## STOCKWATER RIGHTS

Defendant OUWUA contends that plaintiffs are restricted to the use of stockwater on the 190 acres as described in the Hall and Scearce Land Schedules. Paragraph "b" of the stipulations provides that "water for stock watering purposes on the Hall [and Scearce] lands (to the extent of all reasonable necessity therefor, but without undue waste) may be taken from the Government canal during the irrigation season when water is not being delivered for the irrigation of said lands, and at such times in the year outside the irrigation season as water is being run in said canal at the Hall [and Scearce] intake as a matter of project administration." Decree at 147, 150. As I have previously determined, the Hall and Scearce lands referred to in the stipulations are the 190 acres to which an appropriative right attached. Accordingly, plaintiffs are limited by the plain terms of the stipulations to free stockwater for that acreage.

9. For example, if the amount of water diverted in April was done at a rate that was equal to the amount of a continuous flow of 100 miners inches, the second clause of the stipulations would prevent the farmer from diverting in May at a rate equal to a continuous flow of 150 miners inches. Although the first clause would allow a diversion at such a rate, the second clause limits the diversion in May to 125 miners inches.

Defendant OUWUA further contends stockwater may only be used when irrigation water is not being delivered. Although the terms of the stipulations might be subject to this interpretation upon a cursory reading, upon further reflection it becomes apparent that such a construction has little appeal. The suppressed predicate of defendant's contention is that cattle would not need water when pastures are being irrigated. The more rational conclusion to be drawn from the absence of a clause directed to stockwatering when water is being provided for irrigation purposes is that it was presumed that stockwater would be drawn regardless of whether the lands were being irrigated. Thus, there was no need to include such a superfluous clause in the stipulations. Plaintiffs are therefore entitled to water their stock even when irrigation water is delivered.

Plaintiffs contend they are entitled to stockwater outside the irrigation season even when water is not run in the canal as a matter of project administration. Although they concede that the plain language of the stipulations supports defendant OUWUA's interpretation,[10] they argue that because water has historically flowed in the non-irrigation season which has been put to beneficial use for stockwatering purposes, defendants should be estopped from curtailing deliveries of stockwater during the non-irrigation season. As I will explain below, plaintiffs' estoppel claim cannot be sustained. Since the plain language of the stipulations supports defendant OUWUA's interpretation of its obligations, plaintiff's argument cannot lie.

Defendant OUWUA contends that stockwater must be delivered to a location which it has determined to be the Hall intake and the Scearce intake. The court must confess some puzzlement as to the basis of this contention. Nowhere in the stipulations is there an indication that stockwater used during the irrigation season is restricted in its place of delivery to a specified location. The reference in the stipulations to the "Hall intake" and "Scearce intake" relates only to the time during which stockwater may be taken during the non-irrigation season. In light of the plain language of the stipulations, defendant's contention cannot stand. There appears to be a disputed issue of fact, however, as to whether plaintiff's desired place of delivery for stockwater would constitute waste. Therefore, the place of stockwater delivery must await determination at trial.

Finally, plaintiffs object to defendant OUWUA's newly instituted practice of restricting deliveries of stockwater to a fixed amount of 20,000 gallons per day. The stipulations clearly provide for a need-based entitlement, stating that stockwater may be taken "to the extent of reasonable necessity." The parties conceded at oral argument that the amount of stockwater reasonably required is a disputed issue of fact. Accordingly, that issue will be determined at trial.

## VI

## ESTOPPEL

On the basis of historic deliveries to the lands owned by plaintiffs' predecessors which exceeded plaintiffs' entitlement under the Decree, plaintiffs seek to equitably estop[11] the United States and defendant OUWUA[12] from curtailing the deliv-

10. The stipulations further provide that "It is understood, however, that the running of water in said canal outside the irrigation season is not a usual condition, but rather on the other hand that water is seldom if ever taken from the stream or run in the project distribution system at any time except during the irrigation season, and, therefore, is and will not be available ordinarily for stock watering purposes on any lands, including the Hall [and Scearce] lands, except during said irrigation season."

11. Equitable estoppel is more properly treated as a defense, rather than treated as a sword and pled in a complaint. It has, however, been described as a "cause of action." *Acri v. Int'l Ass'n of Machinists,* 781 F.2d 1393 (9th Cir. 1986).

12. All parties concede that defendant OUWUA is the agent of the United States for purposes of administering the Orland Project. Since plaintiffs seek estoppel against OUWUA so as to compel the continued delivery of free water in excess of their entitlement under the Angle De-

ery of the excess amount. Although the Supreme Court has left open the question as to whether an estoppel claim may run against the Government, it has also recently observed that every finding of estoppel that it has reviewed has been reversed. *OPM v. Richmond,* — U.S. —, —, 110 S.Ct. 2465, 2470–71, 110 L.Ed.2d 387, 398 (1990). Under Ninth Circuit law, a plaintiff seeking to assert estoppel against the government must establish more than the traditional elements of estoppel.

> First, "[a] party seeking to raise estoppel against the government must establish 'affirmative misconduct going beyond mere negligence'; even then, 'estoppel will only apply where the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage by imposition of the liability.'"

*Watkins v. U.S. Army,* 875 F.2d 699, 707 (9th Cir.1989), *citing Wagner v. Director, Federal Emergency Management Agency,* 847 F.2d 515 (9th Cir.1988). Whether the government's conduct rises to the level of affirmative misconduct is not a question susceptible to a precise formulation. At the very least, however, it must be shown that there was an affirmative misrepresentation or affirmative concealment of a material fact by the government. *Id.*

In the instant case, the conduct cited by plaintiffs in support of their estoppel claim cannot be characterized as affirmative misconduct. In the first report prepared in 1930 by the first water master appointed pursuant to the Decree, a water right for the combined ranches was listed as 769.5 acre-feet. *See* Watermaster's Report, Ex. 2. The records from 1930–1946 indicate that total diversions to the Hall and Scearce ranches varied from a low of 555.0 acre-feet in 1946 to a high of 1,052.0 acre-feet in 1942. In 1932, E.A. Garland was appointed as Watermaster. He apparently had a limited background in water rights. *See* Watermaster's Report, ¶ 15. There was a hiatus of approximately two decades from 1964 until 1982 in which no watermaster was appointed to administer the rights under the Angle Decree. The U.S. Bureau of Reclamation in 1954 turned over the operation and maintenance of the Orland Project to defendant OUWUA. It appears that defendant OUWUA did not have engineers or hydrographers or meters available to measure diversions to the ranches. *See* Watermaster's Report, ¶ 21. In addition, the ditchriders were local laypersons unqualified to operate complicated measuring equipment.

Upon this historical record, plaintiffs rest their claim of estoppel. Although the lax administration of plaintiffs' water rights under the Decree is regrettable and plaintiffs may have come to rely on the good fortune which had been showered upon them as a result of such administration, no instance of affirmative misconduct has been cited by plaintiffs. As with many of the public works entrusted to federal officials, the care manifested in their administration can be characterized as negligent. While the government's conduct in this matter may have been negligent, it does not rise to the level of affirmative misconduct sufficient to support a claim for estoppel. Plaintiffs have, therefore, failed to meet their burden on the estoppel issue.

In accordance with the above, IT IS HEREBY ORDERED that:

1. Plaintiffs' motion for summary judgment is DENIED;

2. The motion of the United States for summary judgment is GRANTED;

3. The motion of defendant OUWUA is GRANTED on the issues of the acreage to which plaintiffs are entitled to free stockwater and plaintiffs' entitlement to stockwater outside the irrigation season;

4. Summary judgment is GRANTED in favor of plaintiffs on the issue of plaintiffs' entitlement to stockwater when irrigation water is being delivered;

5. Defendant OUWUA's motion for summary judgment is DENIED on the is-

cree, estopping OUWUA would operate against the Government. Accordingly, the higher standard required for a finding of estoppel against the Government must be applied in determining whether OUWUA can be equitably estopped.

sues of whether the place of delivery for stockwater constitutes waste and the amount of stockwater reasonably required; and

6. A Status Conference is now SET for April 29, 1991, at 11:00 a.m. The parties shall file status reports in accordance with Local Rule 240 no later than seven (7) days before the conference.

IT IS SO ORDERED.