**WACKERMAN DAIRY, INC., a California Corporation; Hollis E. Reimers, Plaintiffs–Appellants,**

**v.**

**George G. WILSON, Angle Decree Water Master; Orland Unit Water Users' Association, a California Corporation; United States of America, Defendants–Appellees.**

No. 91–16515.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 3, 1993.

Decided Oct. 21, 1993.

Stuart L. Somach, De Cuir and Somach, Sacramento, CA, for plaintiffs-appellants.

M. Anthony Soares, Minasian, Minasian, Minasian, Spruance, Baber, Meith & Soares, Oroville, CA, and Edward Shawaker, Attorney, Dept. of Justice, Washington, DC, for defendants-appellees.

Before: FLETCHER, REINHARDT, and NOONAN, Circuit Judges.

FLETCHER, Circuit Judge:

Hollis Reimers, owner of Black Butte Ranch, appeals the district court's grant of summary judgment in favor of watermaster Wilson, the United States, and the Orland Unit Water Users' Association (OUWUA).[1]

---

1. Both Hollis Reimers and Albert Wackerman and Wackerman Dairy brought suit against defendants in the district court. Only Reimers appeals the summary judgment order.

This litigation arises out of watermaster Wilson's application of the 1930 "Angle Decree" which determines the rights of the United States and some six hundred landholders in the Stony Creek watershed. Reimers, successor in interest to members of the Scearce family who were among the original parties to the decree, seeks a declaration of her water rights under the decree. What is at issue is the water to which she is entitled without payment to the government. The government admitted in oral argument that it possesses adequate water by reservation or acquisition of appropriation rights to fulfill whatever its obligations are to Reimers under the decree. Accordingly, the priorities of other parties to the decree are not affected.

Reimers contends that the stipulation incorporated in the Angle Decree sets forth the method for calculating the amount of water to which she is entitled as a matter of contractual right. The United States and OU-WUA contend that this contractual right is modified by other provisions of the decree which they assert support watermaster Wilson's application of the decree. The district court had jurisdiction pursuant to 28 U.S.C. § 2201 and the retained jurisdiction of the court set forth in *United States v. Angle*, Equity No. 30, Art. XVI ("Angle Decree"). It entered judgment as reported in *United States v. Angle*, 760 F.Supp. 1366 (E.D.Cal. 1991). Our jurisdiction rests on 28 U.S.C. § 1291. The interpretation of a decree is subject to de novo review. *United States v. Orr Water Ditch Co.*, 914 F.2d 1302, 1307 (9th Cir.), *cert. denied*, 498 U.S. 817, 111 S.Ct. 60, 112 L.Ed.2d 35 (1990). Because we conclude that Reimers' rights are contract-based and not limited by the appropriation rights of the United States, we reverse and remand.

## FACTS

The Stony Creek watershed is located northwest of Sacramento, California primarily in Tehama and Glenn Counties. Stony Creek flows northward from the mountains before turning east, passing by the town of Orland, to join the Sacramento River near Chico, California. The surrounding arid and semi-arid land depend on it for irrigation.

The waters of Stony Creek were first tapped in the second half of the nineteenth century at a time when settlers had just begun the drive to transform California from desert to grazing and farm lands. *See* Marc Reisner, *Cadillac Desert* 2, 48, 53–54, 59, 108 (1986). In 1864 Laban Scearce and a neighbor constructed a diversion dam on Stony Creek and a ditch to divert water to their respective landholdings. At that time it was the intention of the builders to appropriate the waters of Stony Creek for the irrigation of all 416 acres of their land, 250 acres owned by the Scearce family, 166 by the neighbor. In the spring of 1864, twenty to thirty acres of the Scearce land were irrigated.

By 1904 the successors in interest to Laban Scearce and his neighbor,[2] by steady work, had increased substantially the number of irrigated acres served by the diversion works. The Scearce family and their neighbor entered into separate agreements with the Stony Creek Irrigation Company ("SCIC") to convey these works to the company in exchange for the SCIC "furnish[ing] water for all necessary purposes" to the Scearce and Hall lands. 1904 Agreement at 2; *see* Reisner, *supra*, at 108 (discussing the rise of irrigation companies). The agreement stated that SCIC would deliver "125 inches of water measured under a four inch pressure, from the beginning of each irrigation season to the 15th of July of each year and 75 inches of water measured under a four inch pressure from the 15th day of July of each year to the end of the irrigation season." 1904 Agreement at 2. It was "in consideration" of this basic obligation to furnish water at two seasonally specified flow rates during the irrigation season that the Scearce family agreed to "grant, bargain, sell and convey ... all of their right, title and interest ... to water rights, and ditch, and right-of-way." *Id.* at 3. No specific mention was made of the extent of acreage to be served by this contractual water right. The Scearce land was designated simply in terms

---

**2.** Hall was the successor in interest to Laban Scearce's ditch-digging partner of 1864. Albert Wackerman and Wackerman Dairy succeeded to Hall's rights, *see supra* note 1.

of the quarter sections of the township in which the family owned land.

The Reclamation Act of 1902, 43 U.S.C. § 391 *et seq.*, empowers the federal government to acquire water rights for the reclamation and irrigation of land like that served by Stony Creek.[3] Shortly after the passage of the Act the United States Reclamation Service of the Department of Interior embarked upon the Orland Reclamation Project. The United States obtained from the SCIC, by deed, the water rights, diversion works and ditches for the Orland Project. In both the 1907 purchase agreement and 1909 deed, the United States assumed, without reservation, the contractual obligations of the SCIC to provide water to the Hall and Scearce families.

In 1918 the United States sought to adjudicate all rights to the waters of the Stony Creek watershed. Its amended complaint of 1923 indicated that the government understood that Laban Scearce intended to irrigate all Scearce lands by means of the 1864 water diversion[4] and that it interpreted the 1904 agreement, assumed by the United States, as encompassing the obligation to supply water to 250 acres, at a certain rate of flow, depending on the season. In 1926 the Scearce family and the government entered into a separate stipulation explicitly "confirm[ing]" the earlier assumed agreement and setting forth the agreement's "particular[ ] ... sense and meaning" in four alphabetically labelled paragraphs. 1926 Scearce Stipulation at 1. The stipulation did not specify any particular number of acre feet of water to be supplied, or distinguish between irrigated and irrigable acres of land. Both the Hall and Scearce stipulations stated more precisely the rate specifications of the 1904 agreement—"125 *miners* inches and 75 *miners* inches of water (under a four-inch pressure—being *equivalent to 2½ and 1½ cubic feet per second* )"—and adopted the "periods

in each irrigation season described" by that agreement. Angle Decree (Hall & Scearce Stipulations) at 146, 149 (emphasis added). The acreage encompassed by the "Scearce lands" was not otherwise designated or restricted in any way. At the time, the Scearce family was continuing to expand the number of acres irrigated by water from Stony Creek.[5]

In 1928 the United States presented the court-appointed special master with a proposed set of findings and conclusions, and a proposed decree. These were adopted by the special master who then provided for the filing of suggested amendments or objections. Scearce's attorney filed objections based on those portions of the proposed decree creating a "wholly immaterial" distinction between irrigated and irrigable lands. Appellant's Opening Brief at 29. He noted that the "proposed limitation of [Scearce water rights] to a particular 100 acres of land and to the application of only 470 acre feet to the irrigation of their land, is a clear evasion of the contract" to supply water based on a specified rate of flow over certain time periods. *Id.* After a Special Assistant to the United States Attorney General assured Scearce's attorney that he had misread the proposed decree, the objections were withdrawn. *Id.* In 1930 Judge Kerrigan, the district court judge presiding over the multiparty water rights adjudication, adopted the amended findings of fact and conclusions of law and entered the decree "perpetually ... enjoin[ing] [named parties and their successors] from diverting, taking or interfering in any way with the waters of Stony Creek ... [so as to] interfere with the diversion, use or enjoyment of said waters by the owners of prior or superior rights therein as defined and established by this decree." Angle Decree at 178.

---

**3.** The Angle Decree provides the United States with enough "water ... as required ... for irrigation and th[e] building up ... [of lands], through cultivation, cover crops or otherwise, from a desert or arid status to the point of raising profitable crops thereon." Angle Decree at 142. *See* Reisner, *supra*, at 2, 9.

**4.** Laban Scearce's son testified before the special master that he intended to irrigate all 250 acres of the Scearce lands based on the water allocated to the family in the 1904 agreement.

**5.** The United States admitted in a "replication" to Scearce's answer in 1922 that 100 acres of Scearce land were then irrigated and 150 more were irrigable.

894

The Angle Decree is structured compartmentally. Articles I through VI dismiss certain defendants, bar other defendants' claims of right, record waivers, disclaimers and failures to respond on the part of numerous defendants (listed in four separate schedules), and determine that another class of defendants (detailed in two schedules) failed to prove either riparian or appropriative rights to Stony Creek's waters. Article VII sets forth the appropriation rights of some 117 defendants, naming among them the Scearce family. It specifies maximum diversion rights at certain maximum flow rates for designated areas of land in an "Appropriation Schedule." The Scearces receive a maximum diversion right by appropriation according to this schedule of 470 acre feet for 100 acres or 4.7 acre feet of water per acre (a.f.a.) at a flow rate of 1.96 cubic feet per second (c.f.s.). Prominently noted beneath the Scearce entry is the reservation: "The United States diverts and delivers the water called for under this appropriation and priority and holds title thereto as described in Articles VIII and XI of this decree." Angle Decree ("Appropriation Schedule") at 121.

The government's rights are established in Article VIII. Paragraph 5(1) gives the United States the "right, by appropriation, to divert 769.5 acre feet of the waters of Stony Creek ... as of the date of priority of April 15, 1864 ... for the irrigation of the 190 acres of the so-called Hall & Scearce lands ... [as described in designated schedules] appended to this Article of the decree and made part hereof." Angle Decree at 139. The paragraphs following paragraph 7 indicate an "average diversion[]" of 4.05 a.f.a. and the "Project Land Schedule" includes a "Scearce Lands" entry reflecting 100 "total acres." *Id.* at 141, 145. Paragraph 5(2) also notes that the "mutual relations of ... [the United States and the Scearce family] as to the water rights of [the Scearces], are as defined in the stipulations made between said parties ... and made a part hereof." *Id.* at 139. The appended "Scearce Stipulation" incorporates verbatim the 1926 stipulation. Articles X through XIV resolve the rights of "Riparian Owners," the Grindstone Indian

Reservation, and the Glenn–Colusa Irrigation District (the latter also by stipulation). The remaining Articles XV through XVII set forth general provisions.

The Angle Decree was administered for almost sixty years without challenge by the Scearce family or its successors in interest. The available annual watermaster reports reflect a series of different interpretations of the water rights established by the decree. The first watermaster who administered the Angle Decree in 1930 and 1931 allocated 769.5 acre feet to Hall and Scearce combined, an allocation consistent with the government's rights under Article VIII(5)(1) and with the extent of the Scearce lands irrigated at the time. By 1932, the second watermaster determined the Scearce rights were to 470 acre feet for the 100 Scearce acres then under irrigation, in keeping with the "Appropriation Schedule" designating all landholder's water rights. However, this same watermaster revised the stated entitlement in 1935. For the years 1935–46, Hall and Scearce were each allocated 788 acre feet calculated according to the rate of flow and irrigation period specification set forth in their stipulations.[6] After administration of the Orland Project was turned over to the OUWUA in 1954, the Scearce successors enjoyed a supply of water gauged according to the seasonal flow rates specified in the stipulation. For a number of years the Scearce land received 1,099 acre feet of irrigation water. In 1987 watermaster Wilson suggested a change. According to Reimers' complaint, the watermaster entertained a number of interpretations of the decree before settling on the one issue here. At first, he hinged his determination on the "Appropriation Schedule," and allocated 470 acre feet to the Scearce lands. Eventually coming full-circle in terms of the number of acre feet allocated, he concluded that the Scearce entitlement amounted to no more than 405 acre feet—the amount first allocated in 1930 and 1931. The basis for this determination was Article VIII(5)(1) which establishes the government's appropriation rights.

In 1989, plaintiff brought suit. She relied upon the stipulations and portions of the

6. Reimers suggests that irrigated acreage had expanded to about 160 acres by this time.

findings of fact that accompanied the 1930 decree,[7] urging an interpretation of the decree which would result in a variable annual water allocation to Black Butte Ranch dependent on the rate of flow and irrigation season as reflected in the stipulations. Reimers took the position that her contractual water rights—established in the 1904 agreement, assumed by the 1909 deed, "confirmed" in the 1926 stipulation—entitled her to quantities over and above either the scheduled "appropriation rights" (of 470 acre feet) or the government's allocation of Orland Project water (of 405 acre feet).[8] The United States supported watermaster Wilson's determination that Reimers was entitled by contract only to 405 acre feet of "free" Orland Project water, in exchange for the appropriative rights conveyed by the Scearce family to the SCIC and subsequently acquired by the government.

The district court favored the defendants' interpretation of the decree. It focused on two elements—the acreage entitled to water free of charge and the proper measure of water for the entitled acreage. Noting that the total acreage designated in the "Appropriation Schedule" is the same as the acreage referred to in Article VIII(5)(1) (for Scearce successors, 100 acres), the court concluded that the decree established water rights appurtenant only to 100 acres. *Angle,* 760 F.Supp. at 1372–73. Viewing the stipulations as the source for the right to water free of charge, the court noted that these failed to specify the number of acres encompassed by the term "Scearce lands." *Id.* at 1373. Furthermore, if this unspecified term was understood to refer to all Scearce acreage, the court observed that, the priority given Scearce and his successors in paragraph "c" (for 250 acres) would conflict with the priority assigned by the "Appropriation Schedule" (for 100 acres). *Id.* The court considered this conflict fatal because

[n]othing in the Decree would have suggested to the approximately 600 other parties whose rights were adjudicated by the Decree that the lands owned by the Halls and Scearces that were listed in the Project Land Schedule would have special privileges not accorded to other lands described in that schedule. However, by separately setting forth the 190 acres of Hall and Scearce lands in the schedules immediately preceding the stipulations, all parties were put on notice that the stipulations accorded special privileges to the lands described therein.

*Id.* at 1374. Since the general structure of the decree attached rights to "land either specifically described in the Decree or in a schedule incorporated into the Decree," the court considered it logical for the Scearce stipulation to be read in light of the "Scearce Lands Schedule" immediately preceding it. *Id.*

Turning to the measure of the entitlement to water free of charge, the court adopted the government's position that Article VIII(5)(1) caps the Scearce/Reimers water rights at 769.5 acre feet. It disposed of Reimers' argument that the stipulations set a variable quantity of water (based on rate of flow and the length of the irrigation season) as producing an irrational result. By its calculation, such a method for allocating water would allow Scearce and Hall successors the same quantity of water for very different amounts of acreage. The per acre feet of water yield for Hall successors could be as much as one and one-half times the yield for Scearce successors. *Id.* The court was not persuaded by Reimers' reliance on stipulation paragraph "a." It viewed the multiple clauses of this provision as first providing a limitation on the "flow rate for the entire irrigation season," and second, on the monthly flow rate. *Id.* at 1375. Because it discerned a few incremental benefits afforded by the stipulation as interpreted by it (in-

7. The district court confined its construction of the decree to the decree itself and to the court's intent in shaping the decree. *Angle,* 760 F.Supp. at 1371–72. We do not rely on these factual findings and they are not set forth in detail here.

8. The "Appropriation Schedule" links a total maximum diversion right of 4.7 a.f.a. to 100

acres for a 470 acre feet Scearce total. Art. VII. Art. VIII(7) *et seq.* define the "average diversion" rate as 4.05 a.f.a. resulting in a Scearce allocation of 405 acre feet (the proportionate share of the government's 769.5 acre feet allocation "for the irrigation of the … Hall & Scearce lands.")

cluding the benefit of stored water, a longer irrigation season, and a greater cubic feet per second flow than that provided in Article VIII(5)(1)) it concluded that the bargain was not rendered a nullity by the interpretation. *Id.* at 1375. The district court entered summary judgment for the government and Reimers appealed.

## DISCUSSION

■ The Angle Decree emerged from twelve years of litigation to establish the water rights of almost six hundred claimants. It now represents the source of rights for those found to have valid claims to water in the Stony Creek watershed. In adjudicating water rights, courts must look to state law unless it conflicts with explicit Congressional directives. *United States v. Orr Water Ditch Co.*, 914 F.2d 1302, 1307 (9th Cir.), *cert. denied*, 498 U.S. 817, 111 S.Ct. 60, 112 L.Ed.2d 35 (1990); 43 U.S.C. § 383. Under California law there are several grounds upon which private landholders may stake their claim to water.[9] At least three of these grounds are reflected in the decree itself. It

allocates water to defendants according to their appropriation (Art. VII), riparian (Art. XII), and contractual rights (Art. V, Schedule F; Art. VIII(5); Art. VIII, Scearce Stipulation; Art. XIV, Glenn–Colusa Stipulation).[10]

At first blush, Reimers appears to possess two sources of water rights under the decree. Article VII sets forth the "Appropriation Schedule," which accords the Scearce family rights (by appropriation) to 470 acre feet of water, or 4.7 a.f.a. for 100 acres. However, this allocation is prominently noted as belonging to the United States. It represents the rights the government holds by appropriation.[11] While originally listed in the Scearces' and Hall's name, these appropriation rights were acquired by the government by transfer from the SCIC. Article VIII, otherwise devoted to defining the government's rights under the decree, indicates that Reimers' rights are "as defined" by the Scearce stipulation appended. On its face, the stipulation "confirms" the 1904 agreement with SCIC, assumed without reservation by the government in 1909. In this sense it is "con-

---

9. *See In re Water of Hallett Creek Stream System*, 44 Cal.3d 448, 243 Cal.Rptr. 887, 889 n. 1, 749 P.2d 324, 325 n. 1 (Cal.1988) (water rights may be "based upon appropriation, riparian right, or other basis of right") (citing Cal. Water Code § 2501 (West 1971 & Supp.1993)), *cert. denied*, 488 U.S. 824, 109 S.Ct. 71, 102 L.Ed.2d 48 (1988); *see also*, 1 Wells A. Hutchins, et al., eds., *Water Rights Laws in the Nineteen Western States* 13–14 (1971).

10. Each state defines and limits water rights according to state law. *See United States v. Alpine Land and Reservoir Co.*, 983 F.2d 1487, 1491, 1494 n. 8 (9th Cir.1993). The appropriation and riparian rights recognized by the decree are rooted in California law.

With respect to appropriation, the law provides that
the quantity of water to which [a claimant] is entitled by right of diversion is the quantity actually used for beneficial purposes at the time of the original diversion, and which was reasonably necessary for such purposes, plus any additional quantity intended to be applied to future needs at the time of the original diversion, which has been actually put to use within a reasonable time, measured by all the circumstances of the case, after the original diversion, and which was reasonably necessary therefor.
*Haight v. Costanich*, 184 Cal. 426, 194 P. 26, 29 (1920) (en banc). Apparently Laban Scearce in-

tended for his ditch to supply all 250 irrigable acres owned by the family. The family diligently increased the number of irrigated acres, and at least by 1922 the record reflects 100 acres were irrigated.

"A riparian right accords to the owner of land bordering a watercourse the right to make reasonable and beneficial uses of the water on that land." *In re Water of Hallett Creek Stream System*, 44 Cal.3d 448, 243 Cal.Rptr. 887, 889 n. 2, 749 P.2d 324, 325 n. 2 (1988); *see also People v. Shirokow*, 26 Cal.3d 301, 162 Cal.Rptr. 30, 34–35, 605 P.2d 859, 864 (1980) ("[t]he riparian doctrine confers upon the owner of land contiguous to a watercourse the right to the reasonable and beneficial use of water on his land"); Hutchins, *supra* note 9 at 154–56, 180–93.

11. United States has preeminent appropriation rights because its priority dates to Laban Scearce's and his neighbor's ditch-digging efforts in 1864. Under California law "a prior appropriator is entitled to all the water he needs, up to the amount that he has taken in the past, before a subsequent appropriator may take any." *City of Pasadena v. City of Alhambra*, 33 Cal.2d 908, 207 P.2d 17, 29 (1949) (en banc), *cert. denied*, 339 U.S. 937, 70 S.Ct. 671, 94 L.Ed. 1354 (1950), *overruled on other grounds*, *City of Los Angeles v. City of San Fernando*, 14 Cal.3d 199, 123 Cal. Rptr. 1, 537 P.2d 1250 (1975); *see also* Hutchins, *supra* note 9 at 14, 176–79, 396–399, 428 (detailing effect and value of superior priority).

tractual." Nevertheless, because the stipulation is incorporated into a litigated decree, it is necessarily of hybrid nature—the stipulation secures contract rights, but in a manner understood by the Angle court to be consistent with the rights of all the Angle defendants.[12] *See International Assoc. of Firefighters v. City of Cleveland,* 478 U.S. 501, 519, 106 S.Ct. 3063, 3074, 92 L.Ed.2d 405 (1986); *see also* A. Dan Tarlock, *Law of Water Rights and Resources* § 7.08[4], at 7–23 (1992) (describing settlements in the context of water rights adjudications).

■ Thus, the source of Reimers' water rights has changed over time. First, the Scearce family had rights by appropriation. Then, it enjoyed contractual rights, secured initially from the SCIC and later assumed by the government. In 1930, the Angle Decree settled the water rights of all landholders, establishing, by the stipulation incorporated in the body of the decree, the rights Reimers possesses today.[13]

12. Plaintiff implies that the stipulation incorporated into the Angle Decree is not materially different from the stipulation entered into (and also confirmed by Judge Kerrigan) in 1926. It notes that "the Scearce stipulation had been agreed to and approved and was in place long before the actual final adjudication." Reply Brief at 9. Reimers may not escape, on this ground the fact that the stipulation *is* incorporated into the final adjudication. Even if the 1926 stipulation may be described as a consent decree between two parties, the verbatim copy reproduced in Article VIII forms a part of a decree adjudicating the rights of some six hundred parties. Reimers' view to the contrary—"the Scearce stipulation is subject to a single interpretation based upon what the parties agreed to on February 4, 1926, the date the stipulation was signed"—is simply wrong. Reply Brief at 15.

13. The parties dispute whether it is necessary to consider evidence extrinsic to the stipulations in interpreting the decree. This question turns on whether we find ambiguity in the portions of the decree that are critical to our determinations. *See Narramore v. United States,* 852 F.2d 485, 490 (9th Cir.1988); *United States v. 60.22 Acres of Land,* 638 F.2d 1176, 1178 (9th Cir.1980), *cert. denied,* 451 U.S. 985, 101 S.Ct. 2318, 68 L.Ed.2d 842 (1981); *Gila Valley Irrig. Dist. v. United States,* 118 F.2d 507, 510 (9th Cir.1941). It does not depend on whether the stipulations constitute a separate consent decree—capable of being severed for the purposes of interpretation—as Reimers argues (relying on *United States v. City of Miami,* 664 F.2d 435, 440 (5th Cir.1981) (per

### A. The district court & defendants' construction

■ The district court and the government confuse the sources which give rise to the parties' water rights in interpreting the decree. The government argues and the district court erroneously concludes that Article VIII(5)(1) defines the extent of Reimers' rights. This section sets forth the *government's* rights by *appropriation.* The note in the "Appropriation Schedule" recites that the government has title to Scearce's appropriation rights and that it "diverts and delivers water" in accordance with these rights and Articles VIII and XI. Angle Decree ("Appropriation Schedule") at 121. The government even concedes that "Item 5[(1)] actually refers to the government's acquired right," but nevertheless proceeds to ground Reimers' rights in this section of the decree. Respondent's Brief at 50. It contends that the government's obligation to furnish free water is measured by the appropriate rights it acquired from SCIC.[14] *See also Angle,* 760

curiam) ("[w]e must review each part of the decree by separate standards, both in determining appealability and in deciding its substantive merit")). *See Gila Valley,* 118 F.2d at 510 (water decree incorporating stipulations must be construed with regard to the "intention of the court as expressed in the decree"). The Angle Decree may be described in much the same terms as that in the *International Assoc. of Firefighters,* 478 U.S. at 519, 106 S.Ct. at 3074—with respect to Reimers it partakes in attributes of a contract and a judgment. *See also United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971). Because the litigation adjudicated the claims of numerous defendants, barring some claimants altogether and fixing priorities as between those remaining, the court's intention controls. The stipulations, and whatever extraneous materials considered necessary to understand them, must be interpreted in a manner consistent with the overall decree. We do not find the terms of the stipulation as it appears in the overall decree ambiguous. We thus need not resort to the extraneous material urged upon the court to interpret them. *See supra* note 7.

14. The government appears to imply a one-to-one relationship between the first clause of Art. VIII(5) (establishing its appropriation rights) and the second clause (incorporating the Scearce stipulation). The stipulation makes clear no such relationship exists. Paragraph "a" does not identify the government's *rights* under Article VIII(5)(1) with its *obligations.* It states that a

898

F.Supp. at 1372. In linking the extent and nature of Reimers' rights to the Scearce entry in the "Appropriation Schedule," the government and the court seize only upon the specification of acreage, but ignore the total allocation of water by appropriation (470 acre feet according to the 4.7 a.f.a. noted in the schedule). If Reimers' rights were rooted in numbers of acres of land, as defendants repeatedly assert, the appropriation rights appurtenant to that fraction of the land the defendants single out [15] would afford at least 470 acre feet of water, not 405.[16] We conclude that plaintiff's rights arise from contract and stipulation, based on flow and length of season, and thus are not necessarily limited to 470 acre feet—the stated measure of the government's appropriation rights only.

The government attempts to explain away the fundamental error—locating Reimers' rights in the clause establishing its own rights—by maintaining that the stipulations themselves should be read to provide 405 acre feet as the total amount of water to which Black Butte Ranch is entitled. Paragraph "a" of that stipulation states:

 That the 125 miners inches and 75 miners inches of water (under four inch pressure—being equivalent respectively to 2½ and 1½ cubic feet per second) shall be delivered to the Scearce lands from the Government system during the periods in each irrigation season described in said agreement to the extent of the requirement of the lands actually being irrigated

in each season; [2] such requirement to be gauged by the maximum requirement of similar lands under the Orland project, and such deliveries to be by way of irrigation heads of greater amount than the aforesaid 125 miners inches and 75 miners inches, when required, in accord with the usual practice on the project; [3] the total amount of water delivered during any irrigation season to said Scearce lands to be not greater in volume than the amount produced by a continuous flow of 125 miners inches up to July 15th and a continuous flow of 75 miners inches during the balance of the irrigation season; [4] and in any one monthly period of each irrigation season not more than would be provided by a continuous flow for one month of 125 miners (if before July 15th) or of 75 miners inches (if after July 15th), or as the case may be, a proper combination of the two where the monthly period to be considered includes said date of July 15th.

Art. VIII, Scearce Stipulation, paragraph "a". Ignoring the first clause of paragraph "a" (which plaintiff relies upon to establish the variables involved in calculating a total), the government focuses on the second clause which gauges the "requirement" of water for Black Butte Ranch to the "maximum requirement of similar lands." This phrase, the government contends, refers to a later provision stating that the government's "[a]verage diversion[ ] [right is] 4.05 acre-feet per acre during the irrigation season." Art. VIII(7).

---

certain quantity of water "shall be delivered to the Scearce lands from the Government system." Art. VIII, Scearce Stipulation "a"(1) (emphasis added). Because the government has appropriated rights "for the irrigation of the 190 acres of the so-called Hall and Scearce lands," does not mean that its obligation to provide Reimers water is thereby fully met. Article VIII(1) reserves to the United States' system an ample 85,000 acre feet each irrigation season.

The government further attempts to link the obligation to pay for water to a distinction—between "historically irrigated" and "irrigable" land—found nowhere in the agreement or the stipulation. These distinctions are, as Scearce's Angle litigation counsel put it, "wholly immaterial" to the contract-based rights secured in the stipulations. The categories are not reflected in the stipulations or (explicitly) in the 1904 agreement because no acreage limitations were im-

posed and all "vested" water was "free." This is, after all, why the Scearce family was understood to command special privileges.

15. Defendants point out the correlation between the 100 acres representing the Scearce proportion of acreage referred to in Article VIII(5)(1) and the 100 acres accorded appropriation rights in Article VII's schedule. They rely on the "Scearce Lands Schedule" appended to Article VIII(5)(1) which details the very same quarter sections of land and priority dates.

16. The government rationalizes this inconsistency as a function of the stipulations which, it contends, limits Reimers' total water rights, rather than defines them. Contrary to the government's position, the stipulations do not state 4.05 a.f.a. as the new measure of the appropriation-based rights.

It then relies on the "Scearce Lands Schedule" specifically appended to Article VIII(5)(1) [17] to arrive at a total of 100 acres to which the water right attaches. An allocation of 4.05 a.f.a. to 100 acres results in a total of 405 acre feet of water—the same 405 acre feet total as already allegedly provided in Article VIII(5)(1). Significantly, both variables, the a.f.a. measure and the acreage, derive from sections of Article VIII that are strictly devoted to describing the government's rights, not from the stipulation.[18] Moreover, nothing in the decree itself supports transforming an "*average* diversion [right]," Art. VIII(7) *et seq.*, into a "*maximum* requirement." As an average (not maximum) quantity, representing a diversion right (not land requirement), the 4.05 figure simply has no bearing on the second clause of paragraph "a."

**17.** Because the schedule is only appended to the first clause of paragraph 5, and the second clause of the same paragraph specifically acknowledges that the *stipulations* (not the "Scearce Lands Schedule") "define[ ]" the water rights of the Scearce family, these two attachments (the schedule and the stipulations) cannot be assumed to supply meanings for each other. *See* Art. VIII(5)(1) & (2).

**18.** The district court itself acknowledged that the stipulation did *not* specify acreage, apparently leaving the meaning of "Scearce lands" open-ended. It erroneously ascribed the "genesis of the instant controversy" to this alleged omission. *Angle,* 760 F.Supp. at 1373. In our view the acreage was not specified because it had no bearing on the basic method for calculating Reimers' water rights (and only becomes relevant if Reimers fails "actually ... [to] irrigate[ ]" some of the 250 acres). Art. VIII, Scearce Stipulation, paragraph "a". The instant controversy is better understood as one regarding the source of Reimers rights—whether by appropriation (where acreage matters) or by stipulation (where acreage matters only if not *currently* utilized). *See infra* note 14 (distinction between irrigable and *historically* irrigated land misleading).

**19.** The court's reference to the "first clause" pertains to clause (2) and its "second clause" encompasses both clauses (3) and (4). Compare the language of clause (3):

the total amount of water delivered during any irrigation season to said Scearce lands to be not greater in volume than the amount produced by a continuous flow for one month of 125 miners inches up to July 15th and a continuous flow of 75 miners inches during the balance of the irrigation season

with what the court distills from (3) and (4):

Defendants and the district court essentially sidestep the stipulations by casting them as "*limitations* on the exercise of the [Reimers'] water right." Respondent's Brief at 29 (emphasis in original); *Angle,* 760 F.Supp. at 1375. The United States reads an extra word into the second clause of paragraph 5. It states that this provision "notes that 'the mutual relations' of the parties as to this right are *further* 'defined' in the stipulations." *Id.* at 29 (emphasis added). The court reads the stipulations somewhat differently from the United States, despite their common position that the stipulations serve to limit (not establish) plaintiffs rights. Its construction of the various clauses of paragraph "a" fails, in part because it does not accurately distinguish among the clauses [19] or analyze them discretely.[20] Nor do we find the district court's explanation of the benefits accorded Reimers by its construction of the

[t]hat clause provides that the total amount 'in any one monthly period of each irrigation season [shall be] not more than would be provided by a continuous flow for one month of 125 miners (if before July 15th) or of 75 miners inches (if after July 15th).'

*Angle,* 760 F.Supp. at 1374-75.

**20.** From the first clause of paragraph "a" the court distills but one point: it focuses upon the c.f.s. measurement—the 2.5 and 1.5 c.f.s. specifications—as modifying (in its view, to Reimers' advantage) the 2.53 c.f.s. specification in Article VIII(5)(1). It seemingly attaches no significance to the formula specifying the amount of water to be delivered to the Scearce landholdings.

The second clause is understood to "operate[ ] as a limitation on the flow rate for the entire irrigation season." *Angle,* 760 F.Supp. at 1375. However, the clause employs no terms suggesting overall *flow* limitations. It speaks to gauging the water *requirements* of Scearce land to similar project lands and contemplates water *deliveries* occasionally exceeding the flow rate specified in clause (1) as may be "in accord with the usual practice on the project." As for the third and fourth clauses, the judge runs the two together to discern "the same limitation [as identified for overall flow allocations] within monthly periods" and a bar to monthly carryovers. The compression of clauses serves to eliminate the actual content of clause (3) which does not mention monthly adjustments and discusses flow limitations only as part of a formula that sets the "total amount of water [to be] delivered during any irrigation season."

decree persuasive. For example, the court notes that under the stipulations Reimers enjoys a more favorable cubic feet per second flow rate than she would have if the rate were set by the "Appropriation Schedule." *Angle*, 760 F.Supp. at 1375. We find the court's comparison of these flow rates mystifying. First, it compares the rates of flow allotted to the Scearce and Hall families by stipulation with the rate of flow afforded the government by appropriation. *Angle*, 760 F.Supp. at 1375. The latter rate of flow has no relevance to Reimers' rights. She cannot be said to benefit from not having a rate of flow applied to her stipulation rights that attaches only to the government's appropriation rights. Second, under the construction of the decree adopted by the district court, the rate of flow is not the factor limiting the quantity of water to which she is entitled.

### B. *The plaintiff's construction*

Reimers' construction of the decree takes paragraph "a" of the appended stipulations as its departure point. Reimers contends that clauses (1) and (3) provide a *method* for calculating her water rights rather than a *fixed number* of acre feet that quantify water rights as in the "Appropriation" and "Riparian Schedules."[21] Under her interpretation of the stipulations, Reimers is entitled to "[the total] amount [of water] produced by a continuous flow of 125 miners inches [2.5 c.f.s.] up to July 15th and a continuous flow of 75 miners inches [1.5 c.f.s.] during the balance of the irrigation season." Art. VIII, Scearce Stipulation, paragraph "a"(3). The

district court rejects this construction based in part on notice considerations. *Angle*, 760 F.Supp. at 1374. We think the concern is overweighted. The decree clearly flags the fact that the Scearce family has "special privileges" which are "defined" in an appended Scearce stipulation and based on a pre-dated agreement, *not* because of appropriation. It is true that the other Angle defendants may not have been able readily to calculate a specific quantity of water to which Scearce was entitled or find the acreage[22] afforded a certain total acre feet of water free of charge in a "By Contractual Right Schedule." But they were put on notice by Articles VII and VIII that such rights existed and could be calculated.[23] It was not unusual at the time the decree was entered to specify water rights in terms of flow rates. *See e.g., Haight v. Costanich*, 184 Cal. 426, 194 P. 26, 28 (1920) (en banc) (trial court awarded one party 48 miners inches, the other, 52 inches).

The district court also found problematic certain consequences from applying the flow rate and irrigation season formula. Under the formula, despite the fact that they held some eighty acres less land, the Hall successors in interest *might be entitled to receive* a greater a.f.a. than the Scearce successors, thus "defy[ing] common sense." *Angle*, 760 F.Supp. at 1374. Although the allocation may provide more water per acre to the Hall successors, we do not agree that it defies common sense. The 1904 agreement accorded the Halls almost the same rights as the Scearce family. Both the Hall and Scearce agreements featured the same miners inches

---

**21.** Of course the fixed appropriation and riparian rights are also established by a formula. *See* Art. VII (appropriation rights to be "ascertained from, and ... defined and limited by, the product of the [a.f.a.] figures and the number of acres involved"); Art. XII (riparian rights to be "ascertained from, and ... defined and limited, by multiplying the figures in the Riparian Schedule representing diversions in acre-feet per acre for the irrigation season and cubic feet per second per acre ... by the number of acres in the said given areas").

**22.** The district court's concern that the "Project Lands Schedule" fails to give notice that all the Scearce lands were affected by the provisions of Article VIII is misplaced. It is true that the quarter sections are not designated specifically as Scearce land, but they are, easily located by

section (column 1) and township (column 2). Art. VIII ("Project Lands Schedule").

**23.** Article VII's "Appropriation Schedule" clearly puts other appropriators on notice as to the appropriation right appurtenant to Scearce land (and owned by the United States). The only reason a landholder with appropriation rights would concern herself about the total contract-based rights secured to the Scearce family is if the rights carried a priority which could displace her own appropriation-based claim to water. *See supra* note 11. Paragraph "c" of the stipulations puts that landholder (and all others) on notice that in times of drought Reimers enjoys a preeminent priority date for water up to the amount originally allocated to her appropriation rights.

formula, as did the Hall and Scearce stipulations. The fact that one beneficiary may receive more water per acre foot than another does not "dictate[ ] a patently irrational result," *id., see United States v. Gila Valley Irrig. Dist.*, 961 F.2d 1432, 1440 (9th Cir. 1992) ("[w]e decline to depart from the unambiguous language of the Decree just because adherence to that language may favor one party over another to some degree").

Finally, the district court refused to adopt Reimers' construction because

[i]f, as·plaintiff[ ] suggest[s], the lands referred to in the stipulations are the 416 acres as described in the Project Land Schedule, the effect of paragraph "c" would contradict the priorities as set out in the Appropriation Schedule contained in Article VII, which accords the highest priority to only 190 acres.

*Angle*, 760 F.Supp. at 1373. In the first place, paragraph "c" is not the source of Reimers' water rights (they are set forth in paragraph "a"). It only declares what priority she has to water from the "available natural flow in the stream," "in years of drought or great scarcity of water." Art. VIII, Scearce Stipulation, paragraph "c". This provision reaches back to the priority Reimers would have enjoyed if she held her rights by appropriation allocating preeminent priority to 470 acre feet. *See* Art. VII ("Appropriation Schedule"). It does not mean that Reimers is entitled only to 470 a.f. in nondrought years. That would be to substitute the transferred appropriation rights for the contract rights received in exchange for them and the waterworks—the fundamental error identified on appeal. Second, paragraph "c" creates no conflict by allowing Reimers prior-

ity rights in times of drought that are *the same* as the priority rights attached to her predecessor's appropriation rights. The decree as we read it is faithful to the 1904 agreement which protects the SCIC in the event it cannot in times of drought furnish all the water Scearce is entitled to under the contract. SCIC would not forfeit its rights, nor would there be a reversion if

from extreme draught [sic] or other unavoidable cause there should not be sufficient water in the creek at the said proposed new place of diversion to supply the same to [Scearce]. In case there should be such a shortage of water or a failure of supply in the creek, then [SCIC] should furnish to [Scearce] as much of said designated amounts of water as can be gotten from said creek by the usual methods employed and to be employed in taking water therefrom into the said ditch or canal.

1904 Agreement at 3–4.

Plaintiff's construction of the decree does not suffer from the fatal contradictions urged by the government and the district court. The stipulation provides à basis for determining the full extent of Reimers' water rights, an amount determined by reference to flow rates and length of irrigation season, nevertheless, limited in certain respects. While the Scearce stipulation does "confirm[ ]" the 1904 agreement, it notes that certain "particulars" are defined exclusively "herein." Paragraph "a" (2) introduces at least one "modification" unelaborated by Reimers: water requirements will be gauged by reference to similar lands.[24] Also paragraph "a"(1) specifies that the "irrigation season" (one of the formula's crucial variables) is "described in said [1904] agreement." [25] We leave it to

---

**24.** Paragraph "a"(4)'s monthly limitation on stipulated water rights mirrors the limitation imposed on rights held by appropriation. *See* Art. VII ("which said amount shall not be diverted from the stream at any time during said season at a greater rate than the total flow in cubic feet per second stated in such schedule for the month of maximum use").

**25.** That agreement states:
The irrigation season is to commence each year as early in the spring as it may be practical for the said first party to get water into said ditch or canal from said Stony Creek, said time not be later than May 1st of each year and

said season is to extend to such time in the fall as the rain shall commence and furnish water for all necessary purposes without resort with the ditch or canal.
1904 Agreement at 2. Significantly, Article XI provides that "the irrigation season referred to in Article VIII [which incorporates the Scearce Stipulation] as applying to the lands of the Orland Project is defined as and adjudged to be the period beginning on March 15th and ending on October 15th of each year." Angle Decree at 367. We do not here decide which of these provisions determines the irrigation season. The district court is free on remand to revisit the question.

the district court on remand to ascertain the effect of these limitations on Reimers' rights.[26]

## CONCLUSION

The order granting partial summary judgment to the United States is reversed.[27] We determine here only the method for calculating Reimers' water rights. We remand to the district court to fix the quantity of water to which she currently is entitled. On remand the district court must determine (1) whether the irrigation season is fixed or variable and (2) "the maximum [water] requirement of similar lands in the Orland project."[28] Reimers, then, is entitled to that amount of water flowing at the set rates of flow for each irrigation period (2.5 c.f.s. for however many days make up the irrigation period prior to July 15; 1.5 c.f.s. for however many days follow July 15) up to her "requirements" (as gauged by that of similar lands for as many acres as are actually under irrigation). We note that the decree places limits on her priority right under drought conditions. Art. VIII, Scearce Stipulation, paragraph "c". *Cf.* Hutchins, *supra* note 9,

We note that the Angle decree ensures that the irrigation season for every other source of water right is established with particularity. *See* Art. VII (appropriation rights) (April 15–September 15) Art. XI (regarding Grindstone Indian Reservation's rights) (same); Art. XII (riparian rights) (same); Art. XIV (Glenn–Colusa Irrigation District rights) (March 15–October 1).

26. Other limitations apply under California law as acknowledged by the decree itself. *See* Angle Decree at 382 (all water rights are only those "reasonably necessary for ... beneficial use"); *id.* at 329 (defendants appropriation rights subject to beneficial use); *id.* at 352 (government's rights also subject to beneficial use); *id.* at 368–69 (riparian rights). The "reasonable beneficial use" of water is mandated by the state constitution and the code. Cal.Const., art. XIV, § 3; Cal. Water Code § 100 (West 1971 & Supp. 1993); Hutchins, *supra* note 9, at 9–11, 372–73, 438–40, 442, 493, 522. *Cf.* 42 U.S.C. § 372 (for water acquired under the Reclamation Act "beneficial use should be the basis, the measure, and the limit of the right"); *United States v. Alpine Land & Reservoir Co.,* 503 F.Supp. 877, 886–87

at 428–429 (limits on appropriation rights as a result of drought).

**REVERSED** and **REMANDED**.

(D.Nev.1980) (contracts entered into with the government under the Reclamation Act of 1902 may only limit water rights in accordance with beneficial use), *modified on different grounds* 697 F.2d 851 (9th Cir.1983). According to *Haight v. Costanich,* 184 Cal. 426, 194 P. 26, 31 (1920) (en banc), "the amount of water beneficially used during the entire season is determinative of the quantity to which plaintiff is entitled."

27. Reimers also argues that the government is estopped from reducing her water supply. In light of our reversal, we do not address the issue.

28. For whatever reason, the district court did not rule on Reimers' objection to the watermaster's determination of the water requirement of similar lands. First Amended Complaint, ¶ 21. Under its continuing jurisdiction over the decree, the district court may hold a hearing to determine how this requirement should be set. *See* Angle Decree at 176 ("any person, feeling aggriefed by any action or order of the Water Master, may, in writing and under oath complain to the court").